UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————

№ 08 Civ. 8738 (RJS)

———————————

RICHARD ELDEN AND GAIL M. ELDEN,

Plaintiffs,

VERSUS

MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED,

Defendant.

———————————

OPINION AND ORDER
March 30, 2011

———————————

RICHARD J. SULLIVAN, District Judge:

Plaintiffs Richard and Gail Elden bring this action against Defendant Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch"), alleging that Defendant improperly paid various checks in violation of Article 4 of the Uniform Commercial Code (the "U.C.C."), breached the duty of ordinary care in violation of Article 3 of the U.C.C., breached a contract between the parties, and was negligent. Before the Court are the parties' cross-motions for summary judgment.

For the following reasons, both motions are granted in part and denied in part.

I. BACKGROUND

A. Facts

Since May 20, 1982, Plaintiffs, residents of Illinois, have been the owners of a Cash Management Account (the "CMA") located at Defendant's branch office in Chicago, Illinois. (Stipulation of Facts ("Stip.") ¶ 1; Def. 56.1 ¶ 1.) To open the CMA, Plaintiffs signed a

Customer Agreement and a Cash Management Account Agreement (the "CMA Agreement") with Defendant, and signed a VISA Account Application and Agreement (the "Check/Card Agreement") to open an account (the "Check/Card Account") with Bank One.[1] (*See* Pls. 56.1 ¶ 14; Def. 56.1 ¶ 4; *see also* Affidavit of Andrew S. Baron, dated May 7, 2010, Doc. No. 68 ("Baron Aff."), Ex. G ("CMA Agreement"); Reply Affidavit of Andrew S. Baron, dated June 11, 2010, Doc. No. 78 ("Baron Reply Aff."), Ex. B ("Check/Card Agreement").) Plaintiffs signed all three agreements on the same date, and despite the passage of over twenty-five years, these original agreements continue to govern the parties' relationship.

The CMA is an integrated banking product through which Defendant offers three services — a securities margin account, a choice of money market mutual funds, and an account offering check and card services. (*See* CMA Agreement at 1.) Under the CMA Agreement, Defendant would set the "aggregate amount available" for the Check/Card Account and the purposes for which it could be used. (*See id.*) Bank One could also assess fees on Plaintiffs' CMA for any overdrafts. (*See id.* at 1-2.) Defendant agreed to send Plaintiffs a monthly statement detailing "all purchases of merchandise and services and cash advances that were made with the Card and Checks drawn on [Plaintiffs'] Check/Card Account." (*Id.* at 2.)

The Check/Card Agreement states that the CMA Agreement "govern[s] the terms and conditions of the CMA financial service that is being offered by [Defendant]." (Check/Card Agreement at 1.) The Check/Card Agreement also states that Plaintiffs applied for the VISA account "[i]n connection" with their application for the CMA. (*Id.*)

The three contracts contain competing choice of law provisions. The CMA Agreement and Customer Agreement specify that New York law should apply. (Pls. 56.1 ¶ 15.) The Check/Card Agreement states that it is governed by Ohio law. (Def. 56.1 ¶ 7.)

At all times relevant to this action, Plaintiffs' CMA was managed by Lakeview Capital Management, LLC ("LCM"). (*Id.* ¶¶ 17–20.) LCM, which is owned by Plaintiffs' son – himself a former plaintiff in this action – provides various financial services to Plaintiffs and their family. (*Id.* ¶ 17.) In total, LCM manages over 100 banking and brokerage accounts for Plaintiffs' family. (*Id.*) Account statements for the CMA were delivered to LCM's offices, where LCM employees paid Plaintiffs' bills, maintained a check register for the CMA, and prepared reconciliation summaries for the CMA. (*Id.* ¶¶ 18-20.) The CMA statements listed the check number, issuance date, clearance date, payee, and amount (*see* Stip., Exs. 91–126), but did not include images of the front or back of paid checks (Pls. 56.1 ¶ 11.) Defendant also asserts, though Plaintiffs dispute, that each monthly statement included a copy of Defendant's newsletter, "Merrill Lynch & You," later renamed "Total Merrill & You." (Def. 56.1 ¶ 11; Pls. Resp. 56.1 ¶ 11.)

Using the accounting software Quicken (Pls. 56.1 ¶ 30), LCM would record the check

---

[1] The facts in this paragraph and those that follow are taken from the parties' Stipulation of Facts, Local Rule 56.1 statements, and the affidavits and exhibits attached thereto. Where only one party's Rule 56.1 statement is cited, the opposing party does not dispute that fact or has offered no admissible evidence to controvert that fact.

amount, payee name, type of expense, and date of issuance in the check register (*see, e.g.*, Stip., Ex. 92).    Upon receipt of statements from Defendant, LCM would then reconcile the information from the statements and check register (Pls. 56.1 ¶ 32), and examine the reconciliation statement to ensure that "the payee and amount matched, the checks were in a pattern known to be usual for [Plaintiffs] and cleared within 30 days." (*Id. ¶* 34.)

Kelly Leonard worked at LCM from November 5, 2001 to November 29, 2007 as an office assistant. (Def. 56.1 ¶ 58.)  As part of Leonard's duties, she would sort and open mail, review Plaintiffs' invoices, and prepare checks drawing on the CMA.  (Pls. 56.1 ¶¶ 20-21.)  To prepare these checks, Leonard would draft a check, attach the corresponding invoice, and submit it to another LCM employee – first Elizabeth Buffardi and later Kelly Zurek – for their review.  (*Id.* ¶ 21.)  That employee would then "sign" the check using a stamp of Richard Elden's signature. (*Id.* ¶ 24.)   Leonard would then mail the payment and file the invoice.  (*Id.* ¶ 25.) Leonard had primary responsibility for entering information on the check register (*id.* ¶ 31), but she was not authorized to use the signature stamp (*id.* ¶ 29).

From March to October 2006, Plaintiffs' blank check stock was kept in a closet at the LCM offices.  (*Id.* ¶ 22.)  After November 2006, the checks were kept by Richard Elden's assistant at her workstation.  (*Id.* ¶ 23.)   When she was responsible for the signature stamp, Buffardi kept it in a desk drawer in her office.  (*Id.* ¶ 27.)  Zurek kept the stamp in a desk drawer in her office in a hidden compartment.  (*Id.* ¶ 28.)

Between 2003 and 2006, Leonard issued 90 checks without authorization on the CMA,

for a total of nearly $400,000.   (*Id.* ¶ 4.) Defendant paid all 90 checks into either Leonard's personal bank account or that of her credit card company.  (*Id. ¶* 5.)  These checks can be divided into three categories: (1) those made payable to other parties that Leonard deposited into her own account without an indorsement,[2] (2) those made payable to other parties that Leonard deposited into her own account after forging the payee's signature,[3] and (3) those made payable to Leonard's credit card company.[4] (*See id.* at 4; Def. Response 56.1 ¶ 4.) Leonard's thefts were discovered after Plaintiffs caught Leonard stealing other checks in November 2007.  (Pls. 56.1 ¶ 36; Baron Aff., Ex. B., at 60-61.)  Exactly when Plaintiffs first notified Defendant that the checks in question were unauthorized is in dispute.    Plaintiffs allege this occurred in February 2008, while Defendants allege this did not occur until April 2008.  (*See* Pls. 56.1 ¶ 37; Def. Resp. 56.1 ¶ 37.)

## B. Procedural History

Plaintiffs,   along   with   then-plaintiff Thomas Elden, filed this action on October 14, 2008 against Defendant and then-defendants Merrill Lynch & Co. Inc. and JP Morgan Chase Bank, N.A ("JP Morgan").[5] On January 9, 2009, the three defendants moved to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  In an

---

[2] Stip. Exs. 1–9, 11–13, 15–25, 27–37, 39, 41–43, 45–50.

[3] *Id.* at 53–54, 56–57, 59–61, 63–65, 67–68, 70, 72–74, 76–77, 79–80, 82–83, 85–86, 89–90.

[4] *Id.* at 10, 14, 38, 40, 44, 52, 55, 58, 62, 66, 69, 71, 75, 78, 81, 84, 87, and 88.

[5] JP Morgan is the successor to Bank One.

Order dated July 28, 2009, the Court granted Merrill Lynch & Co.'s motion, but denied the motions of JP Morgan and Defendant. *Elden v. Merrill Lynch & Co., Inc*, No. 08 Civ. 8738 (RJS), 2009 WL 2337353 (S.D.N.Y. July 28, 2009). The parties proceeded with discovery. On November 24, 2009, the Court ordered that JP Morgan be dismissed from this action with prejudice, pursuant to a confidential settlement agreement with Plaintiffs. As all of Thomas Elden's claims were dismissed, his participation in this case came to an end as well.

Following completion of discovery, Plaintiffs and Defendant filed motions for summary judgment on May 7, 2010. Both motions were fully briefed on June 25, 2010.

## II. DISCUSSION

Plaintiffs assert both statutory and common law claims against Defendant. U.C.C. Articles Three, covering commercial paper, and Four, addressing bank deposits and collections, govern Plaintiffs' statutory claims.

### A. Legal Standard

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, a court may not grant a motion for summary judgment unless "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of showing that he is entitled to summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to

eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004); *accord Anderson*, 477 U.S. at 248. As such, "if there is any evidence in the record from any source from which a reasonable inference in the [nonmoving party's] favor may be drawn, the moving party simply cannot obtain a summary judgment." *Binder & Binder PC v. Barnhart*, 481 F.3d 141, 148 (2d Cir. 2007) (internal quotation marks omitted) (alteration in original).

Inferences and burdens of proof on cross-motions for summary judgment are the same as those for a unilateral summary judgment motion. *See Straube v. Fla. Union Free Sch. Dist.*, 801 F. Supp. 1164, 1174 (S.D.N.Y. 1992). "That is, each cross-movant must present sufficient evidence to satisfy its burden of proof on all material facts." *U.S. Underwriters Ins. Co. v. Roka LLC*, No. 99 Civ. 10136 (AGS), 2000 WL 1473607, at *3 (S.D.N.Y. Sept. 29, 2000); *see also Barhold v. Rodriguez*, 863 F.2d 233, 236 (2d Cir. 1988).

### B. Choice of Law

As an initial matter, this Court must determine which state's law applies to this case. Plaintiffs argue that New York law applies as a result of the choice of law clause contained in the CMA Agreement. (*See* Pls. Mem. at 7 n.4, 12-15.)[6] Defendant contends that the law of either Illinois or Ohio controls – the former as the location of their branch office or the latter through the choice of law clause contained in the Check/Card Agreement between Plaintiffs and Bank One.

---

[6] Plaintiffs also point to the choice of law clause in the Customer Agreement. (*See* Pls. Mem. at 12-13.) As the Court concludes that New York law governs under the CMA Agreement, it is unnecessary to consider whether the Customer Agreement applies as well.

(*See* Def. Mem. at 7-10.)   For the reasons stated below, the Court will apply New York law, including its version of the U.C.C., to this case.

### 1. Choice of Law Under the U.C.C.[7]

The U.C.C. generally takes a permissive stance toward choice-of-law agreements, provided that they bear a "reasonable relation" to the chosen jurisdiction.[8]   810 Ill. Comp. Stat. 5/1-301(a); N.Y. U.C.C. § 1-105(1); Ohio Rev. Code Ann. § 1301.05.[9] Nevertheless, Section 1-105 identifies some areas where "the parties' right to choose the applicable law" is more limited. N.Y. U.C.C. § 1-105 cmt. 5.   Where one of these provisions "specifies the applicable law, that provision governs and a contrary agreement is effective only to the extent permitted by the law (including the conflict of laws rules) so specified."   *Id.* § 1-105(2).   One such provision is Section 4-102(2), which states that "[t]he liability of a bank for action or non-action with respect to any item handled by it for purposes of presentment, payment or collection is governed by the law of the place where the bank is located . . . [or] the law of the place where the branch or separate office is located." *Id.* § 4-102(2); *see id.* § 1-105(2).

Defendant argues that Section 1-105 prevents the parties from contracting around Section 4-102. (Def. Mem. at 8). Therefore, Defendant contends, regardless of the language in any contract between the parties, Illinois law is applicable to Plaintiffs' U.C.C. claims, as that is where the branch that handled the checks at issue is located.  (*Id.* at 7.) However, Section 4-103 of the U.C.C. allows parties to vary any of the terms of Article 4 "by agreement."[10]  N.Y. U.C.C. § 4-103.   The official comment to Section 4-102 state that "[w]here subsection (2) makes this Article applicable, Section 4-103(1) leaves open the possibility of an agreement with respect to applicable law.  Such freedom of agreement follows the general policy of Section 1-105."   N.Y. U.C.C. § 4-102 cmt. 2(d).[11]

Accordingly, the Court finds that the parties were free to contract around the choice of law requirements of Section 4-102. The Court will thus look to the applicable choice of law clauses in the contracts between the parties to determine which jurisdiction's version of the U.C.C. shall govern.

### 2. Contractual Choice of Law

The three contracts Plaintiffs signed to

---

[7] Where the Illinois, New York, and Ohio versions of the U.C.C. are identical, this Order will cite only to the New York version of the U.C.C.

[8] The parties do not argue that any of the contractual choice of law clauses is invalid.

[9] Illinois has adopted the U.C.C.'s Revised Article 1, which transposes the language of Section 1-105 to Section 1-301 and makes some minor stylistic changes. *See* U.C.C. § 1-301 cmt.; *see also* 2008 Ill. Legis. Serv. P.A. 95-895.  Because neither Ohio nor New York has adopted this change, this Court will refer to this section as Section 1-105.

[10] The U.C.C. does restrict this ability somewhat, prohibiting parties from contracting to "disclaim a bank's responsibility for its own lack of good faith or failure to exercise ordinary care" or "limit[ing] the measure of damages for such lack or failure."  N.Y. U.C.C. § 4-103(1).  Neither restriction applies in this case.

[11] New York courts routinely rely on the official comments in interpreting the U.C.C. *See, e.g., Gen. Motors Acceptance Corp. v. Vucich,* 787 N.Y.S.2d 745, 747 (3d Dep't 2005); *Lawyers' Fund for Client Protection v. Morgan Guar. Trust Co. of N.Y.*, 688 N.Y.S.2d 159, 161 (2d Dep't 1999).

open the CMA contain two competing choice of law provisions, either of which could apply to this action.[12]  The CMA Agreement and Check/Card Agreement were signed on the same date and for the same purpose, as part of Plaintiffs' creation of a CMA account.  (*See, e.g.*, Check/Card Agreement at 1 (noting that agreement was being signed "[i]n connection" with Plaintiffs' execution of CMA Agreement).)  Under both New York and Ohio law, contracts executed at the same time and for the same purpose are to be read together.  *See Micrel, Inc. v. TRW, Inc.*, 486 F.3d 866, 881 (6th Cir. 2007) (applying Ohio law); *This Is Me, Inc. v. Taylor*, 157 F.3d 139, 143 (2d Cir. 1998) (applying New York law).

Reading both contracts together, it is clear that the CMA Agreement – not the Check/Card Agreement – governed the activity that lies at the heart of this case.  The CMA Agreement contains an extensive discussion of the Check/Card Account.  It (1) states the purposes for which Plaintiffs could use these checks, (2) establishes the "aggregate amount available for such purposes," and (3) provides the mechanism by which Defendant and Bank One would pay any checks cut by Plaintiffs.  (*Id.*)  The CMA Agreement further provides that Defendant will send Plaintiffs a "transaction statement" each month, detailing "all purchases of merchandise and services and cash advances that were made with the Card and Checks drawn on the [Eldens'] Check/Card Account."

---

[12] The Court assumes, without deciding, that Defendant may assert the choice of law clause in the Check/Card Agreement, to which it is not a party, against Plaintiffs. *Cf. Air Atlanta Aero Eng'g Ltd. v. SP Aircraft Owner I, LLC*, 637 F. Supp. 2d 185, 190 (S.D.N.Y. 2009) (laying out the New York standard for third-party beneficiaries to contracts); *Freeford Ltd. v. Pendleton*, 857 N.Y.S.2d 62, 67 (1st Dep't 2008) (discussing when a third-party beneficiary to a contract may enforce a choice of law clause).

(*Id.* at 2.)  Indeed, it is undisputed that the CMA statement – which detailed the particulars of each check drawn on the Check/Card Account – was sent to Plaintiffs by Defendant. The choice of law clause in the CMA Agreement gives no hint that it is not intended to apply to checking services – it simply states that "[t]his agreement shall be governed and construed in accordance with the laws of the State of New York."  (*Id.*)

By contrast, the Check/Card Agreement specifies that the CMA Agreement "govern[s] the terms and conditions of the CMA financial service that is being offered by" Merrill Lynch.  (Check/Card Agreement at 1.) The Check/Card Agreement states that the CMA Agreement provides the terms for Defendant to pay Bank One for Plaintiffs' transactions.  (*Id.*)  Much of the Check/Card Agreement relates to finance charges Bank One can apply if Plaintiffs' transactions exceed their authorization limit.  The clause stating that Bank One would send Plaintiffs "periodic billing statement[s]" drives home this point: the statements "will detail, among other disclosures, any overdr[afts] plus Finance Charges thereon, payments and credits and balance due on [Plaintiffs'] VISA Account."  (*Id.* (emphasis omitted).)  The parties have not submitted to the Court any statements from Bank One.

Thus, the Court holds that the plain language of the contracts, read as a whole, demonstrates that the CMA Agreement, along with its New York choice-of-law clause, governs Plaintiffs' claims.  *Cf. Liberty USA Corp. v. Buyer's Choice Ins. Agency LLC*, 386 F. Supp. 2d 421, 426 (S.D.N.Y. 2005) (considering which of two forum selection clauses applied).  Accordingly, the Court will apply New York law to the parties' U.C.C. claims.

## C. Substantive U.C.C. Claims

Before plunging into the substance of Plaintiffs' U.C.C. claims, some definitions are in order – check transactions have a vocabulary entirely their own. A check is written by a "drawer," in this case Plaintiffs or, improperly, Leonard. The bank that pays the check is the "drawee," here Defendant. The check payee "indorses" the check and hands it over to a "depository" bank. For many of Leonard's checks, the depository bank was Bank One. *See generally J. Walter Thompson, U.S.A., Inc. v. First Bankamericano*, 518 F.3d 128, 131 (2d Cir. 2008).

Plaintiffs allege that Defendant is strictly liable for the payment of all ninety of the checks made out and deposited by Leonard. The U.C.C. does "fasten[] strict liability on a bank that charges against its customer's account any 'item' that is not 'properly payable.' A check bearing a forgery of the customer's signature is an 'item' not 'properly payable' and therefore may not be charged against the customer's account." *Monreal v. Fleet Bank*, 95 N.Y.2d 204, 207 (2000) (citations omitted). Forgeries are simply one type of "unauthorized signature," defined as "one made without actual, implied, or apparent authority and includes a forgery." N.Y. U.C.C. § 1-201(43). The official comment to Section 3-406 states that an "obvious case" of an unauthorized signature "is that of the drawer who makes use of a signature stamp . . . and is negligent in looking after it." *Id.* § 3-406 cmt. 7; *see also Zambia Nat'l Comm. Bank, Ltd. v. Fid. Int'l Bank*, 855 F. Supp. 1377, 1388 (S.D.N.Y. 1994) (discussing the use of a signature stamp to make unauthorized signatures). Here, there is no dispute that Leonard was not authorized to use Plaintiffs' signature stamp. (Def. 56.1 Resp. ¶ 23.) Thus, the ninety checks at issue

in this case were not properly payable according to the U.C.C.

However, although the U.C.C. begins with the presumption of strict liability, it allows banks to assert defenses designed to shift the burden onto the party best able to detect the unauthorized or wrongful activity. *See Getty Petroleum Corp. v. Am. Express Travel Related Servs. Co.*, 90 N.Y.2d 322, 327 (1997) ("Losses caused by a forged instrument are in the first instance allocated to the drawee bank because, as between that bank and its drawer, the drawee bank is in the better position to detect the forgery before payment."); *Woods v. MONY Legacy Life Ins. Co.*, 84 N.Y.2d 280, 284 (1994). Defendant invokes two defenses in this case: (1) that Plaintiffs' claims are time-barred, pursuant to Section 4-406, and (2) that Plaintiffs' contributory negligence bars their recovery, pursuant to Section 3-406.

### 1. Section 4-406

Defendant argues that Plaintiffs' claims under U.C.C. Article 4 are barred by Section 4-406. That section places the onus on the customer to "exercise reasonable care and promptness to examine the statement and to discover his unauthorized signature or any alteration on an item and [to then] notify the bank promptly after discovery thereof." N.Y. U.C.C. § 4-406(1). If the customer fails to notify the bank regarding an unauthorized signature within one year of receiving his statement, the customer is precluded from bringing an action against the bank. *Id.* § 4-406(4). The customer's obligation, however, must be triggered by action on the part of the bank. Specifically, Section 4-406 requires the bank to "send[] to its customer a statement of account accompanied by items paid in good faith . . . or otherwise in a reasonable manner make[] the statement and items available to

the customer." *Id.* § 4-406(1).[13]  The U.C.C. defines "items" in part as "any instrument for the payment of money," a definition that includes checks.  N.Y. U.C.C. § 4-104(1)(g). Defendant did not send actual copies of "items paid in good faith" to Plaintiffs, and thus cannot assert Section 4-406 as a defense on that basis.  *See Fundacion Museo de Arte Contemporaneo de Caracas - Sofia Imber v. CBI-TDB Union Bancaire Privee*, 996 F. Supp. 277, 290–91 (S.D.N.Y. 1998) (denying bank the ability to assert Section 4-406 defense because it could not demonstrate that customer actually received statement and items).

Defendant, however, contends that it made the items "available" to Plaintiffs through its internet service, Merrill Lynch On-Line ("MLOL").  Defendant asserts that Plaintiffs had notice of the availability of check images through MLOL as a result of newsletters included with the CMA statements.   While Plaintiffs dispute their receipt of these newsletters and the admissibility of this evidence, the Court holds that the availability of the items online does not "otherwise in a reasonable manner make[] the statement and items available to the customer."   N.Y. U.C.C. § 4-406(1). Defendant's own newsletters make clear that the internet service was an additional service made available to customers on a voluntary basis as an accommodation; as such it was

superfluous to the account statement, rather than a necessary component of it.  (*See, e.g.*, Affidavit of Patricia Convey, dated May 5, 2010, Doc. No. 62, Ex. 3, at 2 (describing ability to view cancelled checks online as one of several "Features That Save You Time and Effort").)

Defendants have cited no case – and the Court is not aware of any – in which a bank's offer of online banking was deemed to satisfy the requirements of Section 4-406.  Indeed, the official comment to Section 4-406(1) explains that this provision "is desirable to cover *unusual* situations.  An example might be where the bank knows a customer has left a former address but does not know any new address to which to send the statement or item or to obtain instructions from the customer." N.Y. U.C.C. § 4-406 cmt. 2 (emphasis added). Situations where courts have resorted to this mechanism confirm as much, and stand in stark contrast to the purely voluntary bank service offered here.  *See Woods*, 84 N.Y.2d at 286 (mailing statements to customer's attorney at customer's request made them available); *see also Brown v. Cash Mgmt. Trust of Am.*, 963 F. Supp. 504, 505–06 (D. Md. 1997) (sending statements to joint opener of account made this information available).

Since the CMA was executed in 1982, long before the advent of the internet or online banking, and since Defendant never altered the agreement or otherwise required Plaintiffs to utilize Defendant's online banking service, the Court finds that Defendant failed to make the checks available to Plaintiffs in a reasonable manner, pursuant to Section 4-406.  Accordingly, the Court finds that Section 4-406 does not bar Plaintiffs' statutory claims against Defendant.

---

[13] New York's requirement to include "items" with an account statement differs markedly from the Ohio and Illinois versions of the U.C.C., which specify that "[t]he statement of account provides sufficient information if the item is described by item number, amount, and date of payment."  Ohio Rev. Code Ann. § 1304.35(A); *see also* 810 Ill. Comp. Stat. 5/4-406(a).  Ohio and Illinois adopted this version of the U.C.C. in 1994 and 1992, respectively.  *See* 1994 Ohio Laws 145; Ill. P.A. 87-582, eff. Jan. 1, 1992.

## 2. Contributory Negligence

Defendant also raises the defense of contributory negligence to its strict liability. *See* N.Y. U.C.C. § 3-406. Section 3-406 shifts liability away from a drawee bank to "[a]ny person who by his negligence substantially contributes . . . to the making of an unauthorized signature," provided that the drawee "pays the instrument in good faith and in accordance with the reasonable commercial standards of the drawee's . . . business." *Id.* The statute thus places requirements on both the drawer and drawee in order to shift the burden away from the drawee bank. The drawer – here, Plaintiffs – must have been negligent, and that negligence must have "substantially contribute[d]" to the making of the unauthorized signature. At the same time, the drawee – Defendant – must have paid the check both in good faith, and in accordance with "reasonable commercial standards." Elsewhere, the U.C.C. defines "good faith" as "honesty in fact in the conduct or transaction concerned." *Id.* § 1-201(19). Here, the checks fall into three groups: checks bearing no indorsement (of which there are forty-six), those with the forged indorsement of a real or fictitious payee (twenty-six), and checks issued directly to Leonard's credit card company (eighteen).

For the reasons set forth below, the Court holds that Defendant did not meet "reasonable commercial standards" with regard to its payment of the unindorsed checks (with the exception of two stamped by the depository bank). As a result, the Court grants summary judgment to Plaintiffs for those forty-four checks. For the remaining checks, the Court finds that Defendant acted in accordance with reasonable commercial standards." Nevertheless, the Court denies both parties' motions for summary judgment with respect to these checks because of the existence of

genuine issues of material fact concerning Plaintiffs' alleged contributory negligence.

### a. Unindorsed Checks

As noted above, Defendant may only resort to the defense of contributory negligence if it paid the checks "in good faith and in accordance with the reasonable commercial standards" of its business. *Id.* § 3-406. Numerous cases establish that a bank does not act in a commercially reasonable manner when it pays checks lacking any indorsement whatsoever. As the New York Court of Appeals stated, a bank does "not adhere to reasonable commercial practice in issuing [a] cashier's check in exchange for [an] unindorsed certified check." *Tonelli v. Chase Manhattan Bank, N. A.*, 41 N.Y.2d 667, 670 (1977); *see also Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Chem. Bank*, 57 N.Y.2d 439, 444 (1982) ("[W]hen a drawer issues a check in the name of a particular payee, the drawee bank is to apply funds from the drawer's account to its payment only upon receiving the payee's authorized indorsement."); *Kersner v. First Fed'l Sav. & Loan Ass'n of Rochester*, 695 N.Y.S.2d 369, 371–72 (2d Dep't 1999) (stating that the failure to verify indorsement on checks drawn on credit line accounts in part barred drawee bank from asserting contributory negligence defense); *Murray Walter, Inc. v. Marine Midland Bank*, 480 N.Y.S.2d 631, 632 (3d Dep't 1984) (finding that, where a check was made payable to two payees, the bank's "payment without the indorsement by [one of the two] was patently improper and a departure from reasonable commercial standards").

As Defendant did not act in a commercially reasonable manner with respect to these checks, it cannot assert the defense of contributory negligence to its unauthorized

payment of them.  Therefore, the Court holds that Defendant is strictly liable for the payment of the unindorsed checks, with the exception of two checks where Bank One supplied a missing indorsement discussed below.

### b. Indorsed Checks

The Court holds that Defendant did pay the remaining checks in good faith and in accordance with reasonable commercial standards and thus may assert a defense of contributory negligence.  However, the Court finds that genuine issues of material fact remain as to Plaintiffs' alleged contributory negligence, and thus denies summary judgment with regard to these checks.

### i. Commercial Reasonableness

Plaintiffs contest Defendant's commercial reasonableness with regard to checks made out to fictitious payees or to Leonard's credit card company, the latter because they were "not made out to proper payees" and the former because they were indorsed by an individual, rather than a corporate payee, and were not properly indorsed over to Leonard's accounts.  With respect to the checks to Leonard's credit card company, Plaintiffs cite to no law supporting the proposition that Defendant's payment of these checks was unreasonable. These checks were made out to an actual payee who properly indorsed and deposited the checks.  Defendant had no notice from Plaintiffs or otherwise that the credit card company was not a proper payee. In addition, during her deposition, Zurek conceded that she herself could not have been sure when the checks were written that a payment to the credit card company was

improper.[14]  Since not even Plaintiffs' account managers could have been aware that the checks to Leonard's credit card company were not properly payable, the Court finds no basis to hold Defendant to a higher standard.

As to the fictitious payee checks, these fall squarely within the scope of Section 3-405.  Under Section 3-405, an indorsement by "any person in the name of a named payee is effective" if the person signing as the drawer "intends the payee to have no interest in the instrument."  N.Y. U.C.C. § 3-405(1).  That is precisely what took place here.  Leonard drew the checks for the fictitious payees without any intention that they would take interest in them and then forged their indorsements for her own benefit.  *See Getty Petroleum*, 90 N.Y.2d at 327.  Section 3-405 thus makes the forged indorsements "effective" as to Defendant.   Its payment of them was commercially reasonable and it may thus assert a contributory negligence defense against its liability for paying them.

Plaintiffs assert that many of these were improperly indorsed by an individual, rather than a corporate payee.  Although a bank's acceptance of such an indorsement is not commercially reasonable, *see In re Lou Levy & Sons Fashions, Inc.*, 785 F. Supp. 1163, 1166 (S.D.N.Y. 1992), the fictitious payee checks in this case were not made out to businesses.  Rather, they were made out to

---

[14] Zurek stated:  "I believe at one time [Plaintiffs] did [have a relationship with the credit card company].  I don't believe they do currently.  [The credit card company] is a bank that handled credit card payments for various retailers, including Marshall Fields; and I do know that the Eldens had a revolving credit account with Marshall Fields at one point.  I don't know exactly the dates."  (Baron Reply Aff., Ex. F, at 104:6-13.)

individuals and bear their forged indorsements.

Finally, two of the unindorsed checks bear Bank One stamps guaranteeing the absence of the payee's indorsement. (*See* Stip., Exs. 26, 51.) Under Section 4-205, depository banks may supply a missing indorsement and such a stamp "is effective as the customer's indorsement." N.Y. U.C.C. § 4-205; *see also U.S. Small Bus. Admin. v. Citibank, N.A.*, No. 94 Civ. 4259 (PKL), 1997 WL 45514, at *7 (S.D.N.Y. Feb. 4, 1997). Again, while these items were not properly payable over Leonard's unauthorized signature, Defendant behaved reasonably in paying them upon receipt from Bank One.

Thus, for its liability as to the indorsed checks, Defendant may assert a defense of contributory negligence pursuant to Section 3-406 as the bank acted in accordance with "reasonable commercial standards."

### ii. Contributory Negligence

If a plaintiff's negligence substantially contributed to the making of an unauthorized signature, it is precluded from making a claim against the drawee. N.Y. U.C.C. § 3-406. The official comment to Section 3-406 notes that "[t]he most obvious case [of negligence] is that of a drawer who makes use of a signature stamp . . . and is negligent in looking after it. The section extends, however, to cases where the party has notice that forgeries of his signature have occurred and is negligent in failing to prevent further forgeries by the same person." *Id.* § 3-406 cmt. 7.

In support of its negligence defense, Defendant points to several instances of purportedly careless behavior by Plaintiffs. For example, Defendant asserts that Leonard

apparently had access to the CMA check stock and Plaintiffs' check stamp. (*See* Def. Opp. at 13.) Defendant further asserts that once Leonard had issued and negotiated the checks, Plaintiffs had additional opportunities to detect and bring a halt to this fraud, but were unable to do so because LCM's check reconciliation process was carelessly superficial. According to Defendant, Plaintiffs merely (1) compared the CMA statement with their check register to see if a check cleared within thirty days after it was written, (2) inquired as to whether it was made out to a "familiar" payee, and (3) determined whether the amount was "'reasonable.'" (*Id.* at 15.) Plaintiffs did not test to see if the checks were supported by a valid invoice at the reconciliation stage. (*Id.*) Further, Plaintiffs did not make in-depth inquiries if some checks bore a different issuance date than that indicated in their check register, nor did they scrutinize checks written out of sequence. (*Id.* at 16-17.) Further, Defendant asserts that Plaintiffs did not exercise due care when Leonard's checks were not made out to "usual" payees. (*See id.* at 18–19.) The sum of these actions and omissions, Defendant argues, demonstrates that Plaintiffs behaved negligently, shifting the burden back to the Plaintiffs for these checks.

Plaintiffs dispute some of Defendant's factual assertions, as well as the conclusions to be drawn from them. (*See* Pls. Reply Mem. 8–9.) As a result, genuine issues of material fact exist as to Plaintiffs' negligence. "The official commentary to the U.C.C. indicates that the question of whether the drawer failed to exercise ordinary care and thereby substantially contributed to the forgery is a question for the finder of fact, to be decided on a case-by-case basis." *Zambia Nat'l Comm. Bank*, 855 F. Supp. at 1387. Thus, summary judgment is rarely warranted

on this issue. In light of the disputed issues of fact concerning LCM's handling of the signature stamp and check stock, which itself evolved over time as LCM changed personnel and offices, the Court denies summary judgment to both Defendant and Plaintiffs on the issue of Plaintiffs' contributory negligence with respect to the entire block of indorsed checks.

## D. Common Law Claims

In addition to their statutory claims, Plaintiffs bring common law claims against Defendant for breach of contract and negligence. Citing Ohio and Illinois law, Defendant argues that common law contract and negligence claims are preempted by the U.C.C. (Def. Mem. at 8.) However, under New York law,[15] such claims are precluded only if they would impose inconsistent rights and liabilities. *See Fischer & Mandell, LLP v. Citibank, N.A.*, 632 F.3d 793, 798 (2d Cir. 2011); *see also Hechter v. N.Y. Life Ins. Co.*, 46 N.Y.2d 34, 39-40 (1978) (common law breach of contract claims survive the adoption of the U.C.C.). Defendant does not point to any way Plaintiffs' common law claims impose rights or liabilities inconsistent with those under the U.C.C., and no such inconsistencies are apparent to the Court. Accordingly, the Court finds that Plaintiffs' claims are not precluded. Defendant also argues that the claims are barred by Section 4-406's time limits (Def. Mem. at 9),[16] but, as

the Court held above, Defendant's failure to supply the "items" to Plaintiff prevents it from asserting that defense. Because there exist genuine issues of material fact with regard to each party's exercise of due care, the Court denies both parties' motions for summary judgment on the breach of contract claim.

However, "'[i]t is a well-established principle that a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated. This legal duty must spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent upon the contract." *Clark-Fitzpatrick, Inc. v. Long Island R.R.,* 70 N.Y.2d 382, 389 (1987) (citations omitted); *see Inter Impex S.A.E. v. Comtrade Corp.*, No. 00 Civ. 133 (GBD), 2004 WL 2793213, at *6 (S.D.N.Y. Dec. 6, 2004). Plaintiffs' account of Defendant's allegedly negligent acts repeats nearly verbatim their allegations of the bank's purported breach of contract. Thus, "[t]he duty which [Plaintiffs] allege[] that [Defendant] breached in its negligence count . . . is identical to the contractual obligation which [Defendant] allegedly breached." *Centre-Point Merch. Bank Ltd. v. Am. Exp. Bank Ltd.*, 913 F. Supp. 202, 209 (S.D.N.Y. 1996). Accordingly, the Court grants Defendant's motion for summary judgment with respect to Plaintiffs' common law negligence claim.[17]

---

[15] By virtue of the choice-of-law provision contained in the CMA, New York law applies to Plaintiff's beach of contract claim.

[16] Section 4-406's time limit applies to common law breach of contract and negligence claims. *See Garage Mgmt. Corp. v. Chase Manhattan Bank*, 803 N.Y.S.2d 60, 61 (1st Dep't 2005) (breach of contract); *New Gold Equities Corp. v. Chem. Bank*, 674 N.Y.S.2d 41, 41-42

(1st Dep't 1998) (negligence).

[17] The outcome would be the same if Plaintiffs' negligence claim was instead analyzed under Ohio or Illinois law. *See Pavlovich v. Nat'l City Bank*, 435 F.3d 560, 569 (6th Cir. 2006) ("Ohio law prevents the recovery of purely economic losses in a negligence action where . . . recovery of such damages is not based upon a tort duty independent of contractually created

### III. CONCLUSION

For the reasons stated above, the Court (1) GRANTS Plaintiffs' motion for summary judgment as to the unindorsed checks, with the exception of the two stamped checks; (2) DENIES both parties' motions as to the indorsed and stamped checks; (3) DENIES both parties' motions as to Plaintiffs' breach of contract claim, and (4) GRANTS Defendant's motion as to Plaintiffs' negligence claim.

IT IS HEREBY ORDERED THAT the parties shall participate in a telephonic conference with the Court on April 29, 2011 at 4:00 p.m. The parties shall gather on one line, then contact the Court at (212) 805-0264.

The Clerk of Court is respectfully directed to terminate the motions located at docket numbers 60 and 66.

SO ORDERED.

RICHARD J. SULLIVAN
United States District Judge

Dated: March 30, 2011
New York, New York

\* \* \*

Plaintiffs Richard Elden and Gail M. Elden are represented by Andrew Steven Baron, David H. Wollmuth, and William Francis Dahill, Wollmuth Maher & Deutsch LLP, 500 Fifth Avenue, New York, New York 10110. Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated is represented by John S. Monical and Peter E. Cooper, Lawrence, Kamin, Saunders & Uhlenhop, L.L.C, 300 South Wacker Drive, Suite 500, Chicago, Illinois 60606.

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/30/11

---

duties."); *First Midwest Bank, N.A. v. Stewart Title Guar. Co.*, 218 Ill.2d 326, 337 (2006) (describing economic loss rule in Illinois).